## BENNETT v. SOVEREIGN CAMP, WOODMEN OF THE WORLD. (No. 1321.)

(Court of Civil Appeals of Texas. Texarkana. May 7, 1914.)

1. INSURANCE (§ 755*)—ESTOPPEL—PAYMENT OF PREMIUMS.

The failure of the collecting officer of the insurer to comply with a custom of sending out notices not required by the policy is available as excuse for the nonpayment of fixed dues only as ground for an estoppel, and, unless the member in default or the one assuming payment of his assessments relied on a continuance of the custom as a reminder of the assessment, and was misled by the failure to receive such notice, there is no estoppel.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1907–1916; Dec. Dig. § 755.*]

2. INSURANCE (§ 819*)—ACTION—SUFFICIENCY OF EVIDENCE—RELIANCE ON CUSTOM.

In an action on a policy defended on the ground of default in the payment of dues, evidence *held* to show that the plaintiff was depending on a local officer to pay the dues, and was not relying upon the custom to send written notices.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 2006, 2007; Dec. Dig. § 819.*]

3. INSURANCE (§ 827*)—FINDINGS—JUDGMENT —"CARRYING A MEMBER."

In an action on a policy of insurance making the constitution and laws part of the contract, requiring the payment of fixed dues and assessments, and providing that default in payment should suspend the member and forfeit the policy, and not authorizing the officers of the local camp to release members from the payment of their assessments, depended on the ground of default in payment of dues, the jury's findings that there existed in the order generally a custom of carrying sick and indigent members, "carrying a member" meaning the custom of paying his assessments for him as they fell due, and that such custom prevailed in the local camp, did not require the court, as a matter of law, to render judgment for plaintiff.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 2011; Dec. Dig. § 827.*]

4. INSURANCE (§ 695*)—MUTUAL BENEFIT INSURANCE—POWERS OF AGENT.

While Sovereign Camp officers in the Woodmen of the World are agents of the Sovereign Camp for certain purposes, they cannot bind the camp by dealing with local members by acting merely within the apparent scope of their authority; that rule having no application where the member knows, or is presumed to know, the extent of the agent's powers.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1836; Dec. Dig. § 695.*]

5. INSURANCE (§ 695*)—PRESUMPTIONS—MEMBER'S KNOWLEDGE OF LOCAL AGENT'S AUTHORITY.

In a mutual benefit association, such as the Woodmen of the World, in which the powers of the Sovereign Camp officers are prescribed by the constitution, accessible to any member, and a part of every insurance contract, a member will be presumed to know them, and in his dealings with the general officers must take cognizance of the limitations placed upon their powers.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1836; Dec. Dig. § 695.*]

6. INSURANCE (§ 819*)—ACTION FOR BENEFITS — SUFFICIENCY OF EVIDENCE — MATTERS OF AVOIDANCE.

Evidence, in an action on a policy, *held* to warrant a finding by the court, notwithstanding a finding of the jury, that the local camp never in effect undertook to carry insured, but that that was done in his behalf as a private undertaking of the local officer.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 2006, 2007; Dec. Dig. § 819.*]

7. INSURANCE (§ 819*)—MUTUAL BENEFIT INSURANCE — SUFFICIENCY OF EVIDENCE — AVOIDANCE.

In an action on a policy, defended on the ground of default in payment of assessments, evidence *held* to warrant a conclusion that insured, by reason of his intemperate habits, was not a proper subject for relief in the matter of carrying sick or indigent members, so as to justify a refusal to render judgment for plaintiff, notwithstanding the jury's finding of a custom of the local camp to carry sick and indigent members, in view of Rev. St. 1911, art. 4847, providing that no subordinate body or any of its officers can waive any of the provisions of the laws and constitution of a fraternal association binding on the members and their beneficiaries.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 2006, 2007; Dec. Dig. § 819.*]

8. INSURANCE (§ 760*)—MUTUAL BENEFIT INSURANCE—DEFAULT IN PAYMENT—AGENT'S ACCEPTANCE OF PAYMENTS AFTER DEATH.

Where a member holding a policy providing for the payment of fixed assessments, and that default therein should suspend the member and avoid the policy, was in default, but the local agent, who had no authority thereto, claimed to have carried him by personally, paying his arrearages upon a small percentage for accommodation, the agent's acceptance of the arrearages after the member's death had no retroactive effect to revive the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1923; Dec. Dig. § 760.*]

9. INSURANCE (§ 819*)—ACTIONS ON CERTIFICATE—EVIDENCE—DEFAULT IN ASSESSMENT.

In an action upon a policy of a fraternal association whose constitution fixed the amount that each member should pay monthly, the jury found that an assessment against insured was not paid by him or any one for him, and other findings predicated upon the presumption that such assessment was due, and after death of the insured the beneficiary tendered the amounts alleged to be due. *Held*, that under the findings the court might assume, in the absence of evidence to the contrary, that an assessment was due.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 2006, 2007; Dec. Dig. § 819.*]

Appeal from District Court, Tarrant County; M. H. Brown, Judge.

Action by Annie E. Bennett against the Sovereign Camp, Woodmen of the World.

---

Judgment for defendant, and plaintiff appeals. Affirmed.

R. M. Rowland and Crenshaw & Boykin, all of Ft. Worth, for appellant. Lattimore, Cummings, Doyle & Bouldin, of Ft. Worth, for appellee.

HODGES, J. On April 27, 1911, Annie E. Bennett instituted this suit against the Sovereign Camp of the Woodmen of the World, seeking to recover the sum of $3,000, alleged to be due on a policy of insurance issued upon the life of J. C. Bennett, her deceased husband. The petition alleged that in 1900 J. C. Bennett was admitted to membership in a local camp of the Woodmen of the World at Bryan, Tex., and received a certificate of insurance for the sum of $3,000, in which the plaintiff was named as the beneficiary; that Bennett died on or about November 20, 1910, and was at the time in good standing in the order. The defendant answered and, among other things, alleged that Bennett had failed to pay the sum of $2.20 due as the October assessment, and that by reason of such failure his policy had, according to its terms and under the by-laws and constitution of the order, become void. It also averred that Bennett died by his own hand; that is, his death was the direct result of his drinking intoxicating liquors and the use of opiates and other narcotics and poisons, and for this additional reason his policy had become null and void. The plaintiff replied by supplemental petition, alleging that, if the October assessment had not been paid in accordance with the requirements of the order, Bennett was sick and financially distressed when it became due, and was therefore unable to make the payment; that the plaintiff communicated information of that fact to Joe B. Reed, the clerk of the local camp at Bryan, of which Bennett was a member. It is further alleged that at this time, and prior thereto, there was a general custom in the order to which Bennett belonged of not requiring the prompt payment of dues from members who were sick and financially distressed; that the camp would continue to carry such members and maintain their good standing till they were restored to health and were again able to make the required payments; that, after the notification referred to had been given to the camp of Bennett's condition, plaintiff and her husband were notified through J. B. Reed, the clerk, that Bennett's dues would be paid till he was restored to health. It is averred that by reason of this custom the appellee had waived its right to demand a prompt payment of the monthly dues according to the terms of the policy and the laws of the order. It was also alleged that there was a general practice and custom on the part of the defendant and its local camps to send printed notices to members, notifying them of their assessments and when due; that

this custom had not been observed at the time the October assessment, for which default is claimed, was due, and for that reason the defendant was estopped to now claim a forfeiture of the policy. Plaintiff also pleaded the following provisions of the constitution of the order:

"Sec. 68. When a beneficiary certificate has been in force for five consecutive years immediately preceding the death while in good standing of the member holding the same, the payment thereof shall not be contested on any ground other than that his death was intentionally caused by the beneficiary or beneficiaries, or by the hands of justice, or from the direct result of drinking intoxicating liquors or from the use of opiates, cocaine, chloral or other narcotic or poison."

The case was submitted on special issues, and the following is the substance of the jury's findings as to the material facts involved: That Bennett's death was due to the use of carbolic acid taken with suicidal intent. At the time of his death assessment No. 241 and his camp dues for October 1910, due November 1, 1910, had not been paid. That testimony had been introduced tending to show that a custom prevailed in the local camp at Ft. Worth and at Bryan as to paying the dues and assessments for members who were sick and unable to pay. The customs of these two camps were different. The custom of the camp at Bryan was formerly to carry a member for more than one assessment, but was later limited by resolution of the camp to one assessment. In failing to pay the assessments after February, 1910, Mrs. Bennett was relying on Joe B. Reed and the custom of the local camp at Bryan. On the last of March or April 1st Bennett was sick and financially distressed, and notice of that fact was given by his wife to the clerk of the camp at Bryan. The clerk shortly thereafter replied by letter, assuring Mrs. Bennett that the dues and assessments of her husband would be advanced and taken care of until she and her husband were able to pay them. That Bennett was in poor health, and unable to work but little from April 1st till his death, on November 20th. That the gross earnings and income of Bennett and wife during September and October, 1910, amounted to $80 per month, and they had money from which to pay the assessment had they desired to do so. Bennett was not sick from April, 1910, to the following November, and was able to work between those dates. There was no evidence as to what he did with his money.

The following questions and answers are quoted literally:

"Q. From April 1, 1910, up to the time of the death of said Bennett, were he and his wife not reasonably able to make payment of the dues and assessments owing by him? A. Yes. Q. If you say that J. C. Bennett was sick and in distressed financial circumstances during the year 1910, then was the same caused by his use of intoxicating liquor and the spending of his earnings for such liquor? A. Yes."

Mrs. Bennett was in poor health and distressed financially from April 1, 1910, up to the death of her husband.

The jury also found that there was a custom of the local camps, known and approved by the Sovereign Camp, to send out to members printed notices of each assessment.

The undisputed evidence shows that Bennett became a member of the Bryan camp while residing in that vicinity, and some time prior to his death had moved to Ft. Worth. During the month of March his wife, who had been paying the assessments, being unable to make the usual monthly remittance, wrote to Joe B. Reed, the clerk of the local camp at Bryan, notifying him of her condition. Reed replied, assuring her that the payments would be taken care of for a while. There is some dispute as to just how long that was to last, and by whom the advances were to be made—whether by Reed himself or by the camp. Neither Mrs. Bennett nor her husband paid any dues after February till a tender of all back dues was made some months after the death of Bennett. Reed testified that the local camp at Bryan had some time before adopted a resolution not to advance more than one assessment for members sick or in distress; that he had made all the payments from February up to the 1st of October from his own private funds, and was personally carrying Bennett's policy; that prior to the 1st of October he addressed several letters to Mrs. Bennett, demanding that she and her husband pay the assessments and reimburse him for his advances; that he received no replies from any of those letters, and refused to continue further advancements for the Bennetts; that the October assessment, which amounted to $2.20, including camp dues, was not paid within the time prescribed by the laws of the order, and the policy therefore became forfeited.

Both parties asked for judgment upon the findings of the jury, and, from the judgment rendered in favor of the appellee, this appeal is prosecuted by the plaintiff below.

The appellant assigns four reasons why the judgment should have been rendered in her favor upon this verdict: (1) It is contended that according to the findings of the jury a custom prevailed in the order and in the local camp at Bryan of sending out printed notices to members reminding them of the amount of their assessments, and when the same should be paid, and that this custom was known to and approved by the officers of the Sovereign Camp. (2) That according to the findings of the jury another custom prevailed in the order and in the local camp at Bryan of carrying members who were sick and "financially distressed," and that this custom was known to and approved by the officers of the Sovereign Camp. (3) That according to the findings of the jury, after the death of Bennett, the entire sum due for his arrearage was tendered to and accepted by Joe B. Reed, the clerk of the local camp at Bryan. (4) That there was no evidence that the proper officers had made a levy of the assessment which it is claimed Bennett had failed to pay, as required by the constitution and laws of the order.

Appellant's brief contains several assignments of error; but we think the foregoing embrace the principal grounds upon which she relies for a reversal of this judgment. These will now be considered in their order.

It is true the jury found that a custom of sending out printed notices prevailed as stated above, although there is not in the record a scintilla of evidence to support such a finding as to the local camp at Bryan. But the question is: Did this finding—assuming it to be properly supported by the evidence—require the court, as a matter of law, to enter judgment in favor of the appellant? We quote the following from the constitution of the Woodmen of the World.

"Sec. 56 (b). Every applicant admitted to membership prior to the 1st of September, 1901, shall each month contribute such assessments as may be levied at his age at entry, except as otherwise provided in sections 42 and 43 of these laws, according to the following table of rates: [Then follows a table of rates showing the amount to be paid upon policies ranging from $500 to $3,000, graded according to the age of the applicant at the time the certificate is issued.] The assessments collected according to the foregoing tables of rates shall be known as the Sovereign Camp Fund."

"Sec. 69 (a). No officer, employé or agent of the Sovereign Camp, or of any camp, has the power, right or authority to waive any of the conditions upon which beneficiary certificates are issued, or to change, vary or waive any of the provisions of this constitution or these laws. Each and every beneficiary certificate is issued only upon the conditions stated in and subject to the constitution and laws then in force or thereafter enacted."

"Sec. 109 (a). Every member of this order shall pay to the clerk of his camp each month one assessment payment as required in section 56, which shall be credited to and known as Sovereign Camp Fund, and he shall also pay such camp dues as may be required by the by-laws of his camp. He shall pay any additional assessments for the Sovereign Camp Fund, and camp dues, or either, which may be legally called.

"(b). If he fails to make any such payment on or before the first day of the month following, he shall stand suspended, and during such suspension his beneficiary certificate shall be void."

[1] These sections fix the amount due from each member, and state the time within which the assessments must be paid. According to the table referred to in section 56 (a), Bennett's Sovereign Camp dues amounted to $1.95 per month. The testimony shows that his local camp dues for that month amounted to 25 cents. These added together make an aggregate of $2.20, which Bennett must have known he was to pay before the 1st day of November, 1910. There are no other provisions of the constitution or laws which require that notice shall be given of these regular monthly assessments. Hence, if there was any duty on the part of the local camp, or its clerk, to send Bennett or

the appellant a printed or written notice reminding them of the monthly dues and the regular assessment, it must be attributed to the custom which the jury found prevailed. The failure of the collecting officer to comply with such a custom of sending out notices, when there was no law requiring it to be done, is available as an excuse for the nonpayment of fixed dues only when it furnishes grounds for an estoppel. Unless the member in default, or the party who had assumed the duty of paying his assessments, relied on the continuance of the custom as a reminder of the assessment, and when it should be paid, and had been misled by the failure to receive such notice, then there is no basis for the estoppel. Hartford Ins. Co. v. Unsell, 144 U. S. 439, 12 Sup. Ct. 671, 36 L. Ed. 496; Thompson v. Insurance Co., 104 U. S. 252, 26 L. Ed. 765; Smith v. Insurance Co., 63 Fed. 769, 11 C. C. A. 411; 3 Cooley's Briefs on Ins. p. 2709. The writer last referred to, in discussing that question, uses this language:

"It is evident that, when a waiver by custom and course of dealing is relied on by the insured or his beneficiary, the first questions to be determined are whether any such custom or course of dealing exists, whether it is applicable to the particular contract, *and whether it was relied on by the insured.*"

It will be observed, not only from the extract quoted, but from a consideration of the authorities cited, that in order for the party claiming the benefit of the custom to justify the failure upon his part to make the stipulated payments, he must show that his failure was due to the nonobservance of the custom.

[2] The only evidence we have as to what the Bennetts relied upon in dealing with the clerk of the local camp at Bryan is to be gathered from the testimony of the appellant. She said:

"The only thing that I paid any attention to in the matter was in the letter that Mr. Reed wrote me. I just depended upon that letter, and then I heard Mr. Bennett speak of the Woodmen of the World; it was nothing in particular that he spoke about, only just about the ordinary business, not anything about the customs at all. He never at any time said anything about the customs of the Woodmen, except when he wouldn't have the money to pay his dues I would ask him about it, and he would say, 'Well, the lodge will pay it,' or they wouldn't drop him when he was sick; that is all I ever heard him say of any kind. I never heard him say anything about the customs. * * * I have stated all I ever heard Mr. Bennett say with reference to any custom or anything of that sort in regard to the Woodmen. Since this suit came up, of course I have studied the customs, but not before."

The jury found, probably upon this testimony, that the appellant and her husband, in failing to pay their assessments after March, 1910, were relying upon the promise of Reed, the clerk, and upon the custom of the camp at Bryan of carrying sick members who were unable to pay their dues. The undisputed evidence shows that neither the appellant nor Bennett had paid any assessments for six or seven months prior to his death, and there is no intimation in the record that they did not know that all of those assessments were due and payable according to the by-laws of the order. Mrs. Bennett's testimony demonstrates that she was not relying upon the reception of any printed notice, but was depending upon Reed and the camp to make these payments for her. Hence there are none of the elements of estoppel presented. While the court cannot render a judgment predicated upon facts opposed to the findings of the jury, where the case is submitted on special issues, yet he may disregard immaterial findings or the finding of immaterial facts, and render judgment upon material facts which he is allowed to find. Where the judgment is not in necessary conflict with the findings of the jury, it will be presumed that the court found the facts necessary to sustain it. Rev. St. art. 1985. We think, under the evidence, the court was justified in rendering a judgment for the appellee, notwithstanding the existence of the facts found by the jury as to that particular custom.

[3-5] Passing to the second question: Did the finding that there existed in the order generally a custom of carrying sick and indigent members, and the further finding as to the particular custom prevailing in the local camp at Bryan, require the court, as a matter of law, to render a judgment in favor of the appellant? Upon this issue the jury returned affirmative answers to the following questions:

"(1) In case a member should be sick, or have sickness in his family, and be in distressed financial circumstances and unable to make prompt payment of his dues and assessments, was there a practice on the part of the local camps of the defendant society at and before the death of the said J. C. Bennett not to require of such member prompt payment of his dues and assessments at the time the same became due, but, on the contrary, to take care of such member's dues and assessments and pay them for him until he should again be able to make payment? (2) At and before the death of the said Bennett was such practice, if any, known to any of the sovereign officers of the defendant society and acquiesced in by them?"

The jury further found that there were 1,600 local camps in Texas; that there was testimony introduced as to this custom in two of those local camps, and it was different in each; that in the Bryan camp "there seems to have been a custom existing to carry a member for more than one assessment, which was later limited by resolution of the camp to one assessment." The custom of "carrying a member" evidently means the custom of paying for the member his assessments as they fall due, for neither the general officers of the Sovereign Camp nor the local camp had any authority to release the member from this obligation to the order. In the Bryan camp the custom was to "carry" the member for one assessment only. The jury also finds that the October assessment due from Bennett was never paid dur-

ing his lifetime. As to that assessment, Bennett evidently was not "carried" by his local camp. This question then arises: Assuming that it was the custom of the Bryan camp to pay to the Sovereign Camp one assessment for its sick and indigent members, did the failure of that camp to comply with that custom relieve Bennett from the legal consequences of the nonpayment of his assessment? Appellant contends in effect that it did; but we do not concur in that view. Bennett was admitted as a member upon his own application, and by the terms of his policy the constitution and laws of the order became a part of his contract of insurance. He bound himself to pay within designated dates the dues and assessments levied. He agreed that suspension of his policy and the forfeiture of prior payments should be the consequences of the nonpayment of those assessments. It manifestly was his duty to see that these obligations to the order were promptly discharged according to the terms of his agreement. If his local camp undertook to do that for him—in other words, to "carry" him—that was a matter of private arrangement between him and his camp, and did not release Bennett from the obligation assumed as the conditions upon which his policy would be continued in force. Section 112 is as follows:

"On or before the 5th day of every month the clerk of each camp shall cause a warrant to be drawn on the banker of his camp, signed by himself and the Council Commander, for all the Sovereign Camp funds in the hands of the banker then due the Sovereign Camp, and forward said funds and all other funds due the Sovereign Camp to the Sovereign Clerk. Such amounts shall be remitted in money order or bank draft with exchange, payable to the order of the Sovereign Banker. Accompanying such remittance the clerk shall also forward such detailed statement of the standing of the members in the camps as shall be required for the information of the Sovereign Clerk, upon blanks furnished for that purpose."

"Sec. 13. If any camp through its proper officers fails to remit the Sovereign Camp fund received by the clerk to the Sovereign Clerk as required to be done by section 112, on or before the last day of that month, the camp and all its members shall stand suspended and shall not be reinstated until payment of all money due from said camp to the Sovereign Camp shall have been received and accepted by the Sovereign Clerk."

"Sec. 119. A member suspended for nonpayment of assessments or dues is not entitled to any benefits of the order." etc.

By the provisions quoted the local camp itself has no authority to release members from the payment of their assessments. If it should fail to pay the required sum, the member would be subject to the same penalty as if the failure was due to his own neglect. A finding by the jury that the Sovereign officers knew and acquiesced in a custom on the part of the local camps of carrying their sick and indigent members does not necessarily imply that these officers acquiesced in a custom on the part of the camps of assuming, but not paying, the dues and assessments of such members. Presumably the local camp may expend its private funds for this or any other legitimate purpose, and the Sovereign Camp officers would have no right to object to such a benevolent use as that of aiding an unfortunate member in paying his monthly assessments. While Sovereign Camp officers are the agents of the Sovereign Camp for certain purposes, they cannot bind their principal, when dealing with the members, by acting within merely the apparent scope of their authority. That rule can have no application where the party dealing with the agent knows, or is presumed to know, the extent of the agent's powers with reference to the particular transaction. In a fraternal and mutual benefit association, such as the Woodmen of the World, the powers and duties of the Sovereign Camp officers are prescribed and regulated by the constitution and laws adopted and promulgated by the Sovereign assemblies. These are accessible to every member and become a part of every insurance contract. The member will therefore be presumed to know them, and in his dealings with the general officers must take cognizance of the limitations placed upon their powers. It follows from this that even though the Sovereign Camp officers had acquiesced in the custom of "carrying" sick and indigent members, prevailing in the local camps, that did not imply that those officers had done that which they had no authority to do—waive the payment of the monthly assessments levied for the benefit of the Sovereign Camp fund.

[6, 7] Again, the court might have concluded, notwithstanding the findings of the jury, that the Bryan camp never in fact undertook to "carry" Bennett; that what was done in his behalf was the private undertaking of Reed, the local clerk. There was ample testimony to justify such a conclusion. Or the court might have concluded from the facts and the findings of the jury that Bennett was not a proper subject for the camp's gratuitous assistance in that respect. The jury found that the gross income of Bennett and wife for the months of September and October amounted to $80 per month. It further found that Bennett's ill health and financial distress were due to the excessive use of intoxicating liquors. It would be attributing to the local camp an unusual degree of indulgence to assume that it would undertake to carry the assessments of a member who was squandering his means and injuring his health by such habits of intemperance. We think there was ample ground for the court to refuse to render a judgment in favor of the appellant upon this ground, notwithstanding the facts found by the jury. Article 4847, Rev. Civ. Stat. 1911, United Moderns v. Pyke (Civ. App.) 76 S. W. 774; Brotherhood of Railway Trainmen v. Dee, 101 Tex. 597, 111 S. W. 396; McWil-

liams v. Modern Woodmen of America (Civ. App.) 142 S. W. 641.

[8] The third ground relied on by the appellant, the reception of all arrearages by the clerk of the local camp at Bryan after the death of Bennett, is equally as untenable as those previously discussed. As before stated, Bennett died on November 20, 1910, and in the February following the sum of $23.40, purporting to be the amount in full of all arrearages due from Bennett, including the October assessment, was paid by check to Reed, the clerk of the local camp at Bryan. The jury found that no part of that sum was ever transmitted to the Sovereign Camp, but that it was all appropriated by Reed to his own personal use. The testimony shows that Reed claimed to have personally made from his own funds all of the advancements by which Bennett's assessments were paid, that he had a habit of charging the members thus accommodated a small percentage, and that this $23.40 was no more than what Bennett owed him. By the laws of the order Bennett before his death had lost his standing, and his policy had become null and void. A reception of this money by the clerk after his death could have no retroactive effect in the way of reviving the policy. The clerk can only bind the order by receiving those dues and assessments which he is authorized to collect. See the authorities above referred to.

[9] The fourth ground is that there was no evidence that an assessment had ever been levied by the Sovereign Camp officers charged with that duty. The constitution itself fixed the amount that each member should pay monthly, according to a certain scale, determined by the amount of the policy and the age of the applicant at the time he became a member. The first question propounded to the jury was as follows:

"Was the Sovereign Camp assessment No. 241 and his camp dues for October, 1910, paid or not paid by J. C. Bennett or any one else for him on or before November, 1910?"

To this the jury answered, "No." Other interrogatories and answers are predicated upon the assumption that an assessment for October was due and to be paid on or before November 1st. The constitution fixed the amount of the assessment, and designated the time when it must be paid. Upon the findings of the jury the appellant asked for a judgment. Under these findings the court had a right to assume, in the absence of evidence to the contrary, that there was an assessment due for the month of October. Even after the death of Bennett the appellant through her attorneys tendered that sum, thereby conceding that it was due. Appellant's case is founded upon the fact that Bennett was excused from the nonpayment of the assessment, not because it was never levied, but because of a custom which justified him in relying upon the camp to notify him of its having been called or of paying it for him.

It is unnecessary to notice the various assignments in detail.

The judgment of the court is affirmed.